Our fourth case for this morning is Glisson against the Indiana Department of Corrections and others in the Correctional Medical Service. So we will start when you're ready with Mr. Sutherland. Good morning. If it pleases the court, my name is Michael K. Sutherland and I'm representing the estate of Nicholas Glisson. Mr. Glisson was 50 years old when he died October 10, 2010. He was incarcerated for less than 37 days. He was under the care of the Indiana Department of Corrections but under the medical care of Corrections Medical Services, which is now known as Corizon. He died of malnutrition. The Menal claim that we raise is that CMS or Corizon failed to adopt a policy which was mandated by the Indiana Department of Corrections to establish treatment plans for chronically ill individuals, inmates. Mr. Glisson had a set of problems which everyone would accept, qualify, and presume for being a chronically ill person. In 2003, he was diagnosed with esophageal cancer. So that's actually one of their points, that he was such an ill person that nothing they could have done would have changed the result anyway. Maybe that's too crude a way of putting it, but that's kind of how I understand it. When the state takes the liberty interest away from an individual, they have a duty to provide the reasonable medical care that is due to that individual. Not a general policy, but a specific policy. The Menal claim that we're making here is that they had to come up with a specific plan. As we pointed out in our brief, Mr. Glisson was meticulous about his personal hygiene. He was able to take care of himself. There was no end-of-life discussion with his family physician, Dr. Fisher. In fact, he was able to come to his home and mow his grass one day before he was arrested. So you must be saying essentially that CMS itself had a policy not to comply with Indiana Department of Corrections Guideline 2.06, the Chronic Disease Intervention Guideline? We are saying that. Because there's nothing wrong. I would take it you don't think there's anything wrong with the state guideline. The state guideline was mandating CMS to do something. We set out on page 30 and 31. Right. Mr. Glisson's medical care and treatment at IDOC was based upon standards of medical and nursing care and generally are not indicated by written policies, procedures, or protocols. DOC does implement health care service directives, but generally none of these directives were relied upon in rendering medical care and treatment. Right. That was quite an admission for CMS to make, and I know they're trying to back away from it at this point. That's true. And if you look at the next page on 32, it outlines what constitutes a chronic care plan. And there are so many issues that they just didn't pick up on. For example, when they brought him to the DOC, he had an aspirator. His stoma, which was installed during one of his surgeries, has to be aspirated six times a day. I did the math. That should have been 200 times. But while he was in the RDC, which is the Receiving and Diagnostic Center, for 14 days, I could only find a record of four times. Not only that, but it wasn't available to him. He had to be handcuffed or at least transported down to the nursing station. It wasn't available to him. He wasn't given his neck brace, which allowed his head to be up, breathe better. There are photographs in the record about that, I think. Pardon me? Photographs of why he needs the brace. Yes, right. And there were photographs also of him, if you want to sort of infer from that, which I think we're entitled to that inference, that he's meticulous about his personal hygiene. So when he shows up there and they do this assessment, they don't create a comprehensive medical plan, treatment plan for chronically ill. And so here are some of the things that they should have done. They should have identified that he needed a neck brace to hold himself up. So can I go back, though, and just say we need to show, or you need to show, if there's a Monell claim at all, you need to show that this is somehow a policy, whether it's a written policy, whether it's the kind of pattern policy, whether it's a final decision-maker policy. We know there are different ways under Monell to do that. But if it was just that they had a great policy and it wasn't followed this time, that's not a Monell claim. I agree. You need to show more than that. So is it essentially a pattern argument that you're making? They didn't write down something. We are never going to make an individual plan. The requirement of DOC was that they, yes, had to have an individual chronic care treatment plan for every individual inmate. No, I understand that. And CMS didn't in this case. Not only that, but they admitted that they don't do it in any case. That's what it says. It says that they specifically, but generally, none of these directives were relied upon in rendering medical care and treatment to Mr. Gleason. So this, if you look at the actual treatment, that also confirms that there is no treatment plan. For example, there's no neck brace. There's not even an identification of a need for a neck brace. The cleaning of the stoma should have been recorded. If it was that important, it wasn't recorded. As I say, only four times in the first 14 days. Three times for the remaining time that it was recorded. There should have been oxygen monitoring. It was clear on several instances when they measured it, most of the time it was below the requirement. Yet they did nothing to alleviate that. Nothing. Food and hydration was reported to by the guards, not by this medical staff. On one occasion, Dr. Mozilla put him in general population because he seemed to be stable. But the nurse who went there the next day, on the 23rd, he'd only been in there less than a day, on the 23rd they found that he was, according to his cellmate, he was talking as if children were attacking him. He had been up all night for 24 hours. He had defecated on himself. He seemed to be agitated. How can he go from having no mental problems on one day and the very next day, according to Dr. Conant, serially slid into this condition and have problems? There were four different doctors involved in this. Nobody wanted to take responsibility for his overall care. Unbelievable. With this many complications, why is nobody in charge? Two specific medical people suggested he was the candidate to be sent to the psych department at Newcastle Correctional. But nobody acted upon that. Nobody realized that the lack of oxygen, the lack of food, the inability to communicate were problems that they could not address. At one point his potassium is very high, too, isn't it? Yes. There was blood work done on the 10th of September, and it indicated he had critical problems. But nobody acted on that. Nobody did anything about it. Of course, potassium is how you execute people, so we know that potassium is very bad. It's lethal. And so when Dr. Fermina is then seeing him for the very first time on the 27th, and he realizes that he needs to take some more medical or blood work and he doesn't see it again until late on the 29th, he realizes he's in critical condition and he calls 911. As another example of the lack of coordination and questioning of the medical records, he issues all these orders. When he gave his deposition, it turns out that he was not able to implement any of those orders because the 911 EMTs arrived beforehand. And then you look at the list of problems that were addressed by the emergency care at Wishart, and then when he comes back he's supposed to be stable, but he immediately goes downhill again, and nobody is monitoring this. Nobody is monitoring this. And that is the chronic problem. Our Minnell claim is without a chronic care plan, which measures both progress and decline, you cannot tell whether you're doing anything to improve this person's condition, to help him address those problems, those chronic problems that he has. There was a weight loss. Nobody wanted to mention the significance of the weight loss. Do we know how tall a man Mr. Gleason was? I'm sorry? Do we know how tall a person was? It's in the record, but he was, I want to say, 5'7". Right. So he comes in at 122 pounds. He slips back to 119. I guess there's some debate about how much evidence in the record, but they weigh him at the hospital at least, and he's still 119.6 or so. Right. Losing 3 pounds in a short period of time is significant, and they didn't seem to want to address that. Another problem, which is obvious from the lack of a comprehensive medical treatment plan, is that there was no attempt to follow through on requesting medical records. They say they did it, but they didn't get them back. They might have done it, but I doubt that they did, because the medical providers did not have any evidence that it was requested. The only one that did was Dr. Fisher, and as soon as he got the fact from Dr. Hermina, he immediately responded. It was in the record. But there was no evidence that they actually requested those records before. They ordered it, but that's not the same thing as obtaining records. So here, Dr. Hermina, for the very first time, after he'd been in prison for over two and a half weeks, now is looking at his medical history for the first time, which suggests that he didn't know what the medical history was from the RDC, which means that there's no coordination, no communication, no collaboration. This is the most dysfunctional deliberately, and I've heard the arguments beforehand. It is by design that it's dysfunctional and departmentalized. It is by design that you have trouble putting your hand on one person, because there's a series of nurses and medical providers, which in my view are not that well qualified, and doctors that are not available. In our case, the doctor leaves about 2 o'clock or earlier every day. Is there any evidence that this absence of a policy of comprehensive treatment plans for chronically ill inmates has caused harm in the past? In the past? Apart from, I mean, we can't base a policy claim on this one instance. All right. This is an interesting, this is my fourth or fifth case against Khorizan, and we are having the most difficult time getting other records of other patients for all kinds of reasons. So what we have is, in this particular case, we have to look to the record of IDEM, or DOC, that says, this is why you have these cases. This is why you monitor them, because they're so difficult to monitor. That's why you have to have a treatment plan. So if you want to look at the statistics, there are anywhere from 54 to 84 deaths a year in the prison system. There are 80 prisons in Indiana. There are, I forgot how many, 22,000 inmates. So we're trying to get those records. We can't get them. There is everything we can do to get those records. We can't get them. But as far as what's in the record in this case, is there anything other than this individual instance, or is there some record evidence that shows that this absence of a policy has caused harm in the past? Well, the absence of a practice of creating individual chronic care plans, yes. That's admitted to. So I do have other evidence of other people who have suffered this. Not in this case, no. And as I say, at the summary judgment stage, it's kind of hard to sort of do that. If we're entitled to every inference, one of the inferences we should have is that in this particular case, the Monell claim that there is a systemic problem of not creating comprehensive treatment plans should be viewed in our favor. Now, do you use the Indiana Department of Corrections directive in any way to support that claim? Are we using it? Yeah. Yes, we are. In the absence of saying, you know, inmate Smith also died of bad coordination or whatever, is there any relevance to the fact that the state itself mandates this kind of coordinated care? Well, I think, yes. If you look on page 32 and 33 where they outline why and what is to be contained in a chronic care, then you can infer from that that if you don't have a specific treatment plan for somebody who comes in with these kinds of problems, you're going to suffer the consequences. Bad results, yeah. So I think that that's what's really going on there. Well, if you'd like to save a bit of rebuttal time. I would. Thank you, Judge. You may do so. Mr. Moore. There's no question here that Mr. Glisson arrived at prison with very serious medical conditions. There's also no question that each and every condition with which he presented was addressed in some form or fashion by the medical professionals that were employed by Correctional Medical Services. But what's interesting is he had had these conditions for quite a while, for six years, and all of a sudden, 40 days later, in the custody of the Indiana Department of Corrections, he's dead. So it makes you think something changed. And you look at those notes from his doctors, Dr. Fisher and the other one, saying that they were very concerned that he would not do well in the correctional setting, and indeed he did not. So, yes, he was a man who needed significant care, absolutely no doubt about that. But why was there such a lack of coordination and failure to keep up with basic needs like suctioning his trach? The answer is there was not. The answer is that the complete factual record reflects that, on admission to the Indiana Department of Corrections, the very first caregiver that assessed Mr. Glisson acknowledged that he required suctioning six times a day, acknowledged that he had a suction machine that needed to be made available to him, and acknowledged that he had other equipment, swabs and antiseptic rinse, that would need to be provided to him. Taking the facts in the other light, acknowledging these things is one thing. Did they acknowledge his neck brace? Because he didn't get that for quite a while. The evidence is that he did not have a neck brace at any point in time while he was in the Indiana Department of Correction. Even though it had been prescribed for him at one point. You allege that it was originally his idea, but certainly a time comes when it's prescribed. There is a point in which he's fitted with a neck brace after he's used it for a while by one of his treaters prior to coming to prison. Right, so the doctor thinks he needs it because it crunches over his trach. Sure. Because he can't hold his head up. Before Mr. Glisson came to the Indiana Department of Correction, he spent several days in the Wayne County Jail, and apparently he was taken directly from the Wayne County Jail from sentencing and didn't have his neck brace at the time of sentencing. There is evidence that the neck brace, along with some other equipment, was delivered to the Wayne County Jail, but the evidence of what came from the Wayne County Jail to the Indiana Department of Correction. Right, it evaporated. I understand. There's no neck brace listed there. There's no neck brace apparently mentioned to Nurse Sanford or any other person at the Indiana Department of Correction. There is no information that makes it to the Indiana Department of Correction, to the CMS providers, at least until Dr. Fisher's records are obtained. I'm not even sure it's there that Mr. Glisson had ever used a neck brace. But it's clear that Mr. Glisson did have, as you describe, Your Honor, the subluxation of his neck. What the primary concern for the caregivers in CMS, what the primary concern about that condition was, was pain. Mr. Glisson was in pain because he had difficulty holding his head up. And so Mr. Glisson came to prison with a prescription for a narcotic pain relief medication. He was permitted to keep that narcotic pain relief medication throughout his stay in prison, which is very unusual. It is atypical for an offender to be permitted to take narcotic pain relief medication while they're in prison. Mr. Glisson was permitted to do that. At one point he also had morphine added to control for pain. So they're very attendant to his concerns about pain. The key problem that Mr. Glisson presented with, as I think we've all discussed, is the tracheostomy and the stoma. Mr. Sutherland, on behalf of the plaintiffs, suggests that he was only allowed to suction his trachea a certain number of times because that's when it happened to have been documented. Well, it happened to have been documented is an interesting point, because as a rule of thumb, doctors follow the idea that if it's not in the record, it didn't happen, which is more or less what we do, too. If it's not in the record, we're not going to consider it. Sometimes. I appreciate that. I'd also like to correct... And you also have this wild admission that you're desperately trying to run away from, that his care was not dictated by written policies, procedures, or protocols. It seems to me if you want to walk away from that, you have to do it at a trial. Why should we believe what you're saying now? I want to be very clear about what our discovery response intended. It's a response to a request for production that requested all policies, procedures, and or protocols relied on in developing the course of treatment for Nicholas Glisson. I understand that was the question, but when you read the answer, we're not dictated by written policies. That's why we're not giving them to you, because it wasn't relevant, you're essentially saying. Not dictated by written policies, procedures, or protocols. If I may, and I don't want to be pedantic with the court, but the entire response is not reproduced in the briefing, but it is available in the record at doc number 69A, page 3. The entire response is actually, Mr. Glisson's medical care and treatment at IDOC were based on standards of medical and nursing care and generally were not dictated by written policies, procedures, or protocols. IDOC does implement health care services directives, but generally none of those directives rely on in rendering medical care and treatment to Mr. Glisson. An index of the IDOC health care services directives is produced herewith. Defendant will consider producing a copy of specific directives identified by plaintiff, which appear relevant to the care. No, I knew that it said that. But that first part says what it says. None of those directives were relied on, and this care wasn't dictated by written policies, procedures. And that's correct. The actual care, the provision, the care that was provided, the medications that Mr. Glisson received, the treatment interventions that he received, the psychiatric services that he received, the services that he received that ultimately permitted him to be transferred to the hospital so that his renal failure could be corrected before he returned to the IDOC. None of those substantive provisions of care are dictated by any Indian Department of Career health care services directive. I understand that, and that, as I understand, is not the plaintiff's point. The plaintiff's point is that if there's a captain of the team, then the way each one of these things is handled would potentially be affected, and that there is no compliance with this coordination of care by what was then the CMS company. Instead, it was individual things that didn't add up to an appropriate care plan. Well, health care services directives do not actually dictate a single, if you will, captain of the ship, to borrow your Honor's term. Well, a site-specific directive, care provided to be organized and planned, included on the master problem list, creation of a complete individualized treatment plan, incorporating activities of all involved disciplines, objectives, table of contents. So, you know, it's like an IEP in schools. You know, there needs to be a plan for each person. So what we see, if you have a couple of points on that, first of all, as we argue fairly lengthily in our briefing, the key focus for the court here is whether Mr. Glisson received constitutionally deficient care. No, well, it's actually, the question is, there are disputed facts about that, it seems to me, given what actually happens in the comparison of the before and the after, the Department of Corrections stay. Before, doing fine, helping with his mother. She says he's not the world's healthiest person, everybody understands that, but he's maintaining himself pretty successfully. Then after, he dies in in-docs care. So that's a problem. And then the question is, does it flow from any policy? That's why it's a Monell issue. It may not flow from any policy. It may be that the policies, or maybe no one should have policies ever, and doctors should just sort of parachute in and do things. I'm not expressing an opinion on that. But the issue is, does the death, the poor level of care that leads to death, flow from a policy that CMS has? The answer to all questions is no. Well, of course, I would expect you to say that. Mr. Glisson's death did not result from any failure to provide constitutionally adequate care. So why does he die when he's in in-doc, and he doesn't die for six years before he goes to the prison? I can answer that question only based on what's in the record. I can't necessarily answer it from a metaphysical perspective, but I can say that Mr. Glisson received constitutionally appropriate care all the way through his stay at the Indiana Department of Corrections. But that's a statement of faith on your part. Fair enough. Somehow. Fair enough, and it's supported by a lengthy, detailed factual record that shows that each and every need, each and every need, that Mr. Glisson presented to prison with, that he developed over the course of his time in prison, was addressed timely. Now, the criticism that has been made that leads to the Monell claim is other things should have been done. More should have been done. Things should have been recognized that suggested developing other problems. Right. You know, so his blood pressure bounces up and down like a yo-yo, and everybody says, oh, these are normal readings. I don't recall seeing that in the record in this case, Your Honor. Yeah, I do. The truth of the matter is his needs are being attended to, and to the extent that the allegation is that this caregiver or that caregiver should have recognized something else in addition. It's not a suit against the caregivers, though. Understood. This is not a suit saying that any caregiver was even committing medical malpractice, much less deliberately indifferent. This is a suit about the policies of CMS. Actually, this is also a suit about medical negligence. There's a medical negligence case that remains pending in the Indiana State Courts. Well, it's not before us. I understand. But I'm making the point that the claim is the manner in which the claim is articulated truthfully sounds in this sort of institutional negligence claim that we typically see in a nursing home case. Yes, there was an acknowledgment of all these problems. Some care was provided, but they missed this. They missed that. They should have done this. They should have done that. That is the nature of the claim. What it comes down to, though, is, again, there is no evidence at all that any constitutionally inadequate care was provided. With respect to compliance with the chronic care process that's set forth in the Healthcare Services Directive, the medical records reflect that we actually did comply with that. If you look at Mr. Glisson's medical records, the EMRs, the electronic medical records, they each contain a recitation of his chronic problems. With respect to the physician visits, when he saw the psychiatrist, when he saw the mental health provider, when he saw Dr. Hermina and the other medical providers, there's an indication of what the treatment plan is going to be. There's changes that are consistent with Mr. Glisson's changing condition over the course of the time that he's in prison. I think the essence of your argument is that there's just a law that says that companies like CMS are never liable under Monell, and that's not what we've held anyway. We've said they're liable in the same way that governmental entities would be. But your factual construct doesn't really leave any room for liability. As long as there's a living, breathing doctor around doing anything, it's fine. That's not really the case, Judge, and that's not really accurate with respect to the manner in which care was provided in this case. I appreciate that things have been said that don't rise to the level of evidence, but there is evidence on the record, an extensive factual record. And what that extensive factual record showed was that Mr. Glisson was initially housed in a reception diagnostic center. Taking the light most favorable to Mr. Glisson? That's not naturally your job, obviously. I understand. You're representing CMS, but in the light most favorable to Mr. Glisson, this looks different. In the light most favorable to everyone, Mr. Glisson was housed for 17 days in a reception diagnostic center. It's hard to understand how there can be other inferences from those facts, that he was there for 17 days. And while he was there for 17 days, his physician was Dr. Jill Gillian, and he had a nursing staff, several of whom charted on him frequently, two of whom charted on him on the same day in collaboration, two of whom charted that they were in communication with custody staff about his needs, what was going on, why he was having oxygen saturation problems, what he also needed. And I'm telling you, if you go back and look at those blood pressure readings, you'll see that they bounce up and down. There's a lot of information in the record, and the potassium, and the renal failure, and the mental confusion, which the testimony in the record suggests is partly from the starvation, partly from other problems that he was having. There's just a huge amount that's going wrong in this record. So to say that everybody was treating him perfectly suggests a very low standard and I agree that the term starvation has been used. And again, Mr. Glisson came to prison malnourished. Cachexia. And he remained malnourished. Cachexia, correct. And an accompanying order by the doctor who used that term, Dr. Hermina, to increase the nutritional supplements that he's receiving in an effort to try to improve his nutrition. That order was, in fact, kept in place and not changed when he went to Wichert Hospital for 7 days, and they also diagnosed malnourishment. He came back with those orders in place. I would like to raise briefly the first thing that was mentioned is that Mr. Glisson died of malnutrition. That is absolutely without support in the record. There is no evidence anywhere that supports that conclusion. There is support for the conclusion that Mr. Glisson died as a result of a pulmonary process related to his stoma. There is evidence that suggests it's possible that he died of a transesophageal fistula. There is evidence that a recurrence of renal failure may have contributed to his death, but there is no evidence anywhere that he died of malnutrition. I'm sorry. The coroner decided he writes down complications of laryngeal cancer, and then he also notes Glisson's malnutrition, extreme emaciation, and cachexia. And then there's the Radins consultation, who identifies the complications causing the death as including malnutrition, acute renal failure with hyperkalemia, dehydration, volume depletion, acute respiratory insufficiency, pneumonia, and altered mental status. These are complications. These are not the direct cause of the death. Well, I'm not sure I would read it that way. The complications that caused his death. So a number of things contributed, including malnutrition. So I think you overstate the record considerably to say that it's not there. Point being, this is a condition that he had at time of death. It's a complicating condition. It's not the focal cause. Well, Radins said it was a causative factor. I disagree with that view of his report and his testimony. No further questions. Thank you. All right. Thank you. Anything further, Mr. Sutherland? Just a couple things I'd like to clear up. There is evidence in the record that the neck brace was delivered to DOC. We have the testimony of the nurse at Wayne County that shipped everything that he had, including his aspirator equipment, flashlight, and a mirror he needed to clean his stomach. There is evidence that they didn't monitor his food intake. A correctional guard said that he'd only had two cartons of milk after being there two days. There is no record whatsoever, contrary to defense counsel's statement, that they monitored his food intake. As the court pointed out, he had apparently renal problems identified in the September 10th blood work, but they didn't act on that. They didn't do anything on that. It was then corroborated, but it was obvious that he was having problems all along. It was corroborated by the second blood work on the 29th when he was transported to Wishart. Wishart identified pneumonia. He had pneumonia all along. Where was the monitoring? They identified that he had lost his voice box two weeks earlier. Where was there a record in there that they addressed that maybe that's one of the reasons he's hard to understand. He has lost his voice box. There was everything but that. There was everything but appropriate care. Based upon this being what I consider an Eighth Amendment theme day, it may be appropriate for this court to consider taking the Monell claims and looking at them more closely and maybe apply respondeat superior as well to Corizon or any other medical provider. There's no particular reason when they are for profit and they make billions of dollars in their operations, there's no particular reason for this court to continue to shield groups like Corizon under Monell. Maybe respondeat superior should be appropriate in that case. The thing that bothers me most is that this is systemic. I wish we had a broader record. The next time I come back here, we will have one because I have other cases in the pipeline. I am having trouble getting discovery because they won't give it up. Imagine, 54 to 84 deaths, and I can't get evidence to demonstrate what the systemic problem is. Nor can we consider it then. Sorry? Nor can we consider it then. You cannot this time, but the next time. Well, I'll come back then. We'll do that. Thank you. Any other questions? Thank you very much. Thanks to both counsel. We'll take the case under advisement. Our fifth case for this morning is Zaya.